UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2014 OCT 15  PM 3: 50

BY_____
DEPUTY CLERK

UNITED STATES OF AMERICA          )
                                  )
        v.                        )        Case No. 5:12-cr-71
                                  )
TERRENCE DAVIS                    )

## OPINION AND ORDER DENYING DEFENDANT'S
## MOTION TO SUPPRESS EVIDENCE
(Doc. 23)

This matter came before the court on August 20, 2014 for an evidentiary hearing on Defendant Terrence Davis's motion to suppress evidence (Doc. 23). Burlington Police Department Detective Daniel Merchand and Sergeant Brian LaBarge (formerly Detective LaBarge) testified on behalf of the government. The parties completed their post-hearing evidentiary submissions on September 2, 2014, and their post-hearing briefing on September 12, 2014, at which point the court took the matter under advisement.

Defendant is charged in a one-count indictment with knowingly and intentionally possessing with the intent to distribute heroin, a schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1). Defendant seeks suppression of all evidence seized during the execution of a search warrant for a hotel room at the University Inn in South Burlington, Vermont on February 23, 2012.[1] Defendant asserts that Detective Merchand's affidavit in support of the search warrant (the "Affidavit") contained material factual misstatements and omissions which, if corrected, obviate a finding of probable cause. In addition, he contends that Detective Merchand acted either intentionally or recklessly in making the alleged misstatements and omissions in the Affidavit. The

_____

[1] Defendant was never identified as one of the occupants of Room 207, the hotel room in question, however, his standing to raise a constitutional challenge to the search warrant is uncontested.

government opposes the motion.

The government is represented by Assistant United States Attorney Michael P. Drescher. Defendant is represented by Maryanne E. Kampmann, Esq.

## I. Findings of Fact.

In 2012, Detective Merchand was a member of the Burlington Police Department and assigned to its drug unit. He has been a member of law enforcement since 1999 and has participated in over one hundred controlled buys.

On February 23, 2012, Detective Merchand organized, supervised, and participated in an attempted controlled buy through a confidential informant (the "CI"). The CI had never previously completed a controlled buy for law enforcement, but he had spoken to Detective Merchand once previously in 2011 by telephone. During the 2011 telephone call to Detective Merchand, the CI provided information to law enforcement but declined to participate in a controlled buy. At the time, the CI was either just getting out of or going into a substance abuse rehabilitation program. There is no evidence that the information the CI provided in 2011 proved useful or was corroborated.

On February 16, 2012, the CI came with his girlfriend to the Burlington Police Department and expressed fear that his life was in danger because he owed a drug debt to a group of heroin dealers known to law enforcement as "the Chicago group." The CI offered to assist law enforcement in exchange for consideration on his pending charges. The eleven pending charges against the CI included two charges for false information to a police officer.

Detective Merchand interviewed the CI, who provided information about a group of individuals who were selling drugs out of the University Inn in South Burlington, Vermont. The CI mentioned that a member of this group, "Philly," was also staying at the Anchorage Inn in South Burlington. The CI told Detective Merchand that "Philly" was part of this group prior to his arrest in Connecticut. Detective Merchand knew that "Philly" was incarcerated at the time.

The CI also provided information about someone named "Tim" who drove a silver Honda with out-of-state plates. The CI provided Detective Merchand with the cell phone

2

number for Tim. Detective Merchand did not attempt to contact "Tim" and concluded that a state subpoena for the cell phone records associated with Tim's cell phone number would take too long.

Although the CI was the sole source of law enforcement's information that, in February 2012, individuals were dealing drugs from the University Inn, Detective Merchand had previously received a tip from a staff member of the Anchorage Inn that certain individuals who had stayed there were "suspicious." The staff member provided Detective Merchand with identifications cards for two African-American males. Neither of these identification cards pertained to Defendant.

Law enforcement did not conduct surveillance at the University Inn between February 16, 2012 and Detective Merchard's next meeting with the CI. On the evening of February 22, the CI met with Detective Merchand and advised him that earlier that day he had purchased heroin from a person or persons staying at the University Inn. The CI claimed to have purchased the heroin on another person's behalf, but he did not identify this person or explain why he was purchasing heroin while cooperating with law enforcement. Detective Merchand testified that he did not know whether the information provided by the CI regarding this purchase was true. He nonetheless included it in the Affidavit. He arranged for the CI to participate in a controlled buy at the University Inn the following day.

On the day of the controlled buy, law enforcement searched the CI's person and clothing for drugs, contraband, and currency and found none. Law enforcement then provided the CI with $350 of pre-recorded funds in order to complete a purchase of heroin. While the CI was not compensated for the controlled buy, he was provided with $100 to pay off a drug debt he allegedly owed to the same individuals.

Detective Shawn Burke transported the CI to the University Inn, arriving at approximately 2:15 p.m. During the transport, the CI called a cell phone number to arrange a purchase. There is no evidence that Detective Merchand heard this communication or that it was recorded. The CI asked Detective Burke how many officers would be in the area during the controlled buy. Detective Merchand, who heard

3

this exchange, did not find it unusual because "informants will ask questions about how things are going to take place because they're concerned about their safety and about being compromised as an informant." Doc. 29 at 18:8-11. The CI was dropped off in the University Inn parking lot.

Four officers surveilled the CI from various vantage points. Detective Merchand was located in his vehicle parked across the street from the University Inn, and he was "multi-tasking" as he conducted surveillance by "operating the radio, operating [his] telephone, taking notes about what was transpiring," and "also videotaping." *Id.* at 11:20-22, 13:13-19. He turned off the video when necessary to make and take telephone calls so that "[t]here wasn't any rhyme or reason for the video," *id.* at 13:16-17, and he attempted to direct the video camera towards both the CI and the suspects. Detective Merchand was the only officer who conducted video and audio surveillance. During the controlled buy, he had telephone contact with both Detective LaBarge and the CI. Because Detective Merchand was using a single cell phone, he could only talk to one person at a time, although he was able to put Detective LaBarge on speaker phone when he needed to do other things. The video recording introduced at the court's evidentiary hearing depicts only portions of the controlled buy and the CI is not always visible in it.

The CI wore a device on his person which recorded his verbal interactions and which transmitted those interactions to Detective Merchand. Detective Merchand testified that the device did not transmit every interaction due to "interference" and "feedback" and if the device was out of "range." *Id.* at 60:1-6, 16-25. Accordingly, Detective Merchand could not "always hear" what was being said by or to the CI. *Id.* at 60:16-21. Detective Merchand was the only officer at the scene who could listen to the transmission from the CI's recording device. The audio recording introduced at the court's evidentiary hearing captures only some of the CI's statements, virtually none of the target's statements during the controlled buy, and is inaudible or unintelligible in several parts.

Detective Burke was parked in the parking lot of the University Inn and was tasked with conducting surveillance from that location. Detective Chris Young initially

obtained a room on the first floor of the University Inn, but he did not have eyes on the lobby. He later secured a room on the second floor, across from Room 207. Detective LaBarge, while dressed in plain clothes, followed the CI on foot from a distance.

### A.    The Surveillance Video.

From his vehicle, Detective Merchand videotaped some of the CI's movements.[2] The video depicts the CI approaching the University Inn on foot, as a member of the surveillance team observes that the CI is "just hanging out by the trash cans." Doc. 30-1 at 2:4. The CI then walks behind a lattice next to the entrance to the University Inn. Detective Merchand remarks the CI "is entering the lobby way of the hotel." *Id.* at 2:8-9. Detective Merchand's investigative notes similarly reported that the CI was observed "entering the area of the south entrance." Def.'s Ex. E at 1. The video recording does not depict the CI entering any part of the University Inn and, in his testimony, Detective Merchand conceded that the CI never entered the building. Detective Merchand also conceded that during the time the CI stood behind the lattice, he was not clearly visible, although part of his body could be seen.

While standing behind the lattice, the CI states, "I am on foot now. My girl dropped me off so I am like, I didn't want her to see what was going on so I had her drop me off . . . so I am just like, waiting out here." Doc. 30-1 at 2:11-12. After hearing this statement from the CI, Detective Merchand states that it "[s]ounds like he is on the phone with the guy now." *Id.* at 2:14. The video then depicts the CI emerging from behind the lattice, holding a cell phone to his ear. Detective Merchand reports that the CI is "back out in front." *Id.* at 2:17.

Thereafter, the CI walks towards the University Mall, which was not a planned part of the controlled buy and was done without authorization. The video depicts three African American males walking from the direction of the mall. While two of the males walk away from the CI, one male approaches the CI, and they appear to speak briefly.

---

[2] Where there are discrepancies concerning the purported controlled buy, the court has relied on the video and audio recordings from the surveillance conducted that day. *See Scott v. Harris*, 550 U.S. 372, 378-81 (2007) (ruling that when there is "a videotape capturing the events in question," a court should rely on the facts "depicted by the videotape").

5

The male is wearing jeans, a black hooded sweatshirt, and a black hat with a brim. The conversation between the CI and this male was not transmitted to Detective Merchand and is not contained on the audio recording. After the controlled buy, the CI told Detective Merchand that the male instructed him to wait inside the mall and told him that they would call him later.

Despite repeated orders directing the CI to remain outside of the mall, the CI entered the University Mall. This is also not depicted on the video. Detective LaBarge was behind the CI on foot at the time and testified that he followed the CI inside. For approximately ten to fifteen seconds, Detective LaBarge lost visual surveillance of the CI. When he found the CI near the Bon Ton store, Detective LaBarge directed the CI to call Detective Merchand, who spoke with the CI and told "him again [he wanted] him outside where [the officers could] keep eyes on him." Doc. 29 at 28:24-29:1.

Meanwhile, the three African American males were observed walking towards the University Inn and entering it. The Affidavit recites that Detective Young saw the three males enter Room 207, located on the second floor. These events are not depicted on the video and are not recorded on the audio. It is unclear whether Detective Young and Detective Merchand were in radio contact at the time.

As the CI left the mall and walked back towards the University Inn, the video depicts him making what appears to be a series of cell phone calls en route. The content of these cell phone calls was not recorded. The officers note that the CI continues to look around and appears "paranoid and worried about the presence of police around him." *Id.* at 29:20-24. In his testimony, Detective Merchand acknowledged that the CI was more paranoid than "the usual CI." *Id.* at 30:16-17. The audio records the following exchange:

DETECTIVE MERCHAND: Alright. You still have eyes on him? He's coming back to the hotel. Says he's gonna do the deal with these guys here in the lobby.

DETECTIVE LABARGE: Well, I can see him walking. I am all the way over to the Sport Shoe Center and I can see him walking back towards that way but I don't know how far we can push him.

6

DETECTIVE MERCHAND: Alright. Well, I mean - I am . . .

DETECTIVE LABARGE: Hold on. Hold on. Let me step out - we should just run up on these bitches right now.

DETECTIVE MERCHAND: [Detective Young] got the room.

DETECTIVE LABARGE: Yeah. No shit. Exactly. We should run up on them right now. 'Cause they said all three of 'em out?

DETECTIVE MERCHAND: Yeah.

DETECTIVE LABARGE: He's making his way across to the bank.

DETECTIVE MERCHAND: Yeah. I got him. I got him. Stay right there. Yeah. I got him. He's f***ing paranoid motherf***er.

DETECTIVE LABARGE: Dude. He's not listening.

DETECTIVE MERCHAND: He keeps looking - he's more worried about you right now.

DETECTIVE LABARGE: He's what?

DETECTIVE MERCHAND: He's more worried about you right now. He keeps f***ing looking back there.

DETECTIVE LABARGE: Dude. I was literally going to punch him in the face in the mall. I was gonna.

DETECTIVE MERCHAND: Alright. He's back on Dorset Street. [The CI's] walking back towards the mall. I've got eyes on him. He's getting on the phone now.

Doc. at 30-3 at 2:1-20.

After this exchange, the video depicts the CI meeting outside of the University Inn with an African American male, who was wearing a white t-shirt, a black sweatshirt, and a black hat. The male appears to be the same person with whom the CI spoke briefly before entering the mall. In the audio recording, Detective Merchand explains to the surveillance team what is transpiring:

7

> Meeting with a black male in front of the entrance right now. Black shirt, white tee, black hat. He's giving him a hard time about what car he came in. I don't think he is gonna do the deal with him. Helper's walking back towards Dorset Street now. He's getting on the phone. He's calling me.

Doc. 30-3 at 3:3-6. In his testimony, Detective Merchand explained that he did not think the deal would take place "[j]ust because [of] the fact that [the suspect] gave [the CI] a hard time about coming in the car." Doc. 29 at 38:2-7. He, however, changed his opinion because, "[i]n speaking with [the CI], he said the transaction happened, and then when I met with him, he had heroin." *Id.* at 39:6-13.

From Detective Merchand's vantage point, he could see only the chest, shoulders, and heads of the two males, but he could not see their hands. The CI is nonetheless in close proximity to the other male. Detective Merchand neither witnessed nor recorded a hand-to-hand transaction. His notes refer to an "attempted controlled purchase, 2/23/12." *Id.* at 56:2-4. Although no other member of the surveillance team witnessed a hand-to-hand transaction, the audio recording captures Detective LaBarge reporting to Detective Merchand: "I think your motherf***ing, your dude might've saw me walking out and he literally just struck a deal on those guys, 'cause I heard . . . (Inaudible)." Doc. 30-3 at 3:1-2.

Thereafter, the CI walked away from the male and called Detective Merchand to have the officers pick him up in front of the University Mall. The audio records Detective Merchand asking if there was a deal, and the CI responding, "Yeah. I got it, but he was kinda like, he's like, Where's your truck at?" Doc. 30-3 at 3:9.

Detective Burke picked up the CI at approximately 2:36 pm. Approximately thirty minutes elapsed between the time Detective Burke dropped off and picked up the CI. Detective Burke transported the CI from the scene to a location where Detective Merchant searched the CI, found a quantity of heroin, and took a statement from him. These events are not depicted in the video. In his statement after the controlled buy, the CI identified the person from whom he purchased the heroin as wearing black sweats, a hooded sweatshirt, and headphones.

8

The audio recording reflects that, in the course of the controlled buy, the CI called a person whom he referred to as "Mom" and told her: "Now I'm gonna need f***ing money because they give you money to do it, Mom. Now they're going to take their money back and I'm going to be f***ed." Doc. 29 at 56:18-21. Detective Merchand testified that he did not authorize the CI to make this call and that he does not know what the conversation is about.

## B.    The Affidavit and Search Warrant Application.

The controlled buy concluded at approximately 2:50 p.m. From approximately 3 p.m. to 6 p.m., Detective Merchand prepared a search warrant application for Room 207 of the University Inn to search for evidence of heroin distribution. Detective Merchand drafted and signed the Affidavit, which consists of twelve numbered paragraphs.

The Affidavit states that Detective Merchand met with the CI during the week of February 13, 2012, and that the CI advised that he/she was "battling heroin addiction," had been "sober for several days," "wished to change his/her lifestyle," and hoped to receive consideration for pending criminal charges in Chittenden County. Doc. 23-1 at 5, ¶ C.1. In his testimony, Detective Merchand conceded that he does not recall the CI telling him that he wished to change his lifestyle. He testified that if the CI said this on February 16, 2012, he could not say whether he believed the CI at that time. He testified that he later understood that the CI did not seek a lifestyle change because the CI was subsequently convicted of a federal drug trafficking crime.

The Affidavit does not identify the pending charges against the CI. Detective Merchand acknowledged in his testimony that there were eleven pending charges, two of which were for false information to a police officer. Detective Merchand testified that he included a prior conviction for false information to a police officer because it was "important." Doc. 29 at 71:6-11. He decided not to include the CI's pending charges for this same crime in the Affidavit because someone could allegedly use them to identify the CI. He could not explain how this might occur or whether the court's records could be searched by merely supplying the nature of the charge in question. Detective Merchand

9

testified that he has never personally obtained a court record but has other people in his office do that for him, although he knew that pending charges would be disclosed in a record check and could be obtained from the court by supplying an individual's name. He testified that he believed the information he included in the Affidavit regarding the CI's criminal history comported with Vermont law.

The Affidavit states that after Detective Merchand received verbal confirmation from the Chittenden County State's Attorney's office that the CI would receive consideration for his charges in exchange for his cooperation, the CI advised Detective Merchand that he would be willing to assist law enforcement. The Affidavit does not state that the CI was provided $100 to pay off a drug debt. Detective Merchand's testimony provided no explanation as to why this information was omitted.

The Affidavit recites that the CI provided Detective Merchand with the following information: that he could purchase heroin from certain individuals from whom the CI had been "regularly purchasing heroin" for personal consumption and to sell to support his own habit; that these individuals included a group of males from Pennsylvania and New York who regularly sold large amounts of crack and heroin in the greater Burlington, Vermont area; and that the group usually stayed at the Anchorage Inn or the University Inn in South Burlington, Vermont. Doc. 23-1 at 6, ¶ 3. The CI identified the leader of the group as a male named "Philly," and described him "as a light skinned African American male with a big beard, with bushy hair pulled back." *Id.* The CI identified other individuals who worked with "Philly" as "Low," "Real," "Rico," and "C." *Id.* The CI reported that these individuals were arriving in the Burlington, Vermont area every three to four days to sell 100 bundles, or approximately 1,000 bags, of heroin.

The Affidavit notes that in late January 2012, Detective Merchand received a tip from an employee at the Anchorage Inn that a suspicious male had stayed there frequently. At that time, the employee provided Detective Merchand with a copy of the suspicious male's Pennsylvania Photo Identification Card, which in turn identified a person named Ryan C. Mohr and depicted him with a "big bushy beard and hair that appeared to be pulled back." *Id.* The employee also provided Detective Merchand with a

10

copy of a New York Photo Identification Card of a male, identified as Eugene T. McNair, who had checked into the Anchorage Inn around the same time as the suspicious male. When Detective Merchand showed the CI the identification card for Ryan C. Mohr, the CI advised the individual depicted was known as "Philly."

The Affidavit states that Detective Merchand conducted a criminal record check of the CI that revealed "the following offenses: DLS, DUI #1, False Info-LE Officer/ Implicate Another (which was related to a motor vehicle stop), DUI #2, Alcohol-Minor-Possession, Vehicle Operation-Careless of Negligent, Violation of Probation, Poss. of Marijuana-Misdemeanor, Disorderly Conduct, Resisting or Obstructing Officer[,] and Criminal Possession of a Controlled Substance in the 7th Degree." *Id.* at 6, ¶ 2. Although this summary of the CI's criminal history accurately describes the nature of the CI's convictions, it does not accurately reflect the number of those convictions, which total nineteen as of the date of the controlled buy. The Affidavit, however, correctly notes that the CI had only one conviction for false information to a police officer.

The Affidavit states that Detective Merchand met with the CI on February 22, 2012, during which the CI advised that "Philly" was not in town; that "Rico" was handling the heroin sales; and that, if he was not available, "Rico" would have another individual handle the sale. This other individual was unknown to the CI. The CI provided the cell phone numbers for "Rico," the unknown individual, and a third person named "Tim," who the CI reported also made deliveries in a silver Honda with out-of-state plates at the Buffalo Wild Wings parking lot in the Price Chopper complex on Shelburne Road.

According to the Affidavit, Detective Merchand met with the CI again on February 23, 2012, and the CI advised the Detective that "Rico" had contacted him the previous night; that "Rico" had arrived with heroin and crack; and that "Rico" was staying at the University Inn. The CI also advised that he had recently learned that "Philly" had been arrested in Connecticut. Detective Merchand conducted a criminal record check for Ryan C. Mohr that confirmed that he was incarcerated in Connecticut; that he had been on probation "out of" Allentown, Pennsylvania; and that he had been

11

arrested previously in Pennsylvania for a "Violation of the Controlled Substance and Cosmetic Act and Criminal Homicide," which had been dismissed. *Id.* at 6, ¶ 5.

The Affidavit notes that the CI had visited the University Inn on the previous day to obtain heroin "on behalf of" another person and that the person who sold the heroin was the previously unknown individual who "Rico" had informed the CI would be handling the heroin sales. *Id.* at 7, ¶ 6. The CI believed this individual's nickname was "Rell" and that "Rico" and "Rell" were staying together at the University Inn. When Detective Merchand showed the CI the photo identification card for Eugene T. McNair, the CI advised that the male depicted was involved with "Rico" in selling heroin. Detective Merchand conducted a criminal record check that revealed that Eugene T. McNair had been arrested in New York City for Criminal Possession of Stolen Property-5th Degree, Robbery-2nd, and Aided by Another and Assault 3rd Degree: With Intent to Cause Physical Injury.

After the CI advised that he could call either "Rico" or "Rell" to purchase heroin, Detective Merchand proceeded to set up a controlled buy. The Affidavit indicates that Detective Merchand first searched the CI to ensure he had no drugs, contraband, or currency on his person. Detective Merchand provided the CI with "sufficient funds" to complete the controlled buy and directed the CI to call the number for the individual he believed to be "Rell" to set up a purchase. *Id.* at 7, ¶ 7. The CI was then dropped off near the University Inn, and another police officer, Detective Young, obtained a room at the Inn so that he could attempt to identify the room where "Rico" and "Rell" were staying. The Affidavit recounts the circumstances of the controlled buy as follows:

> Once at the hotel CI was kept under continuous audio and visual surveillance from the time [he] exited the undercover law enforcement vehicle until [he] was observed speaking with one African American male who was accompanied by two other African American males in the area of the University Inn. The three males and CI did not appear to conduct a transaction and CI stayed in the area and was kept under audio and visual surveillance. After the brief meeting with the three males the males walked to the hotel and entered the northern most entrance of the University Inn building located closest to Dorset Street. Once the males were inside the hotel Det. Young was able to leave his room and observe the three males

12

enter Room 207 on the second floor of the hotel. . . .

After the males entered the room a short period of time elapsed and
the CI was telephonically contacted and was instructed to meet at the hotel
to complete the purchase. As noted the males did not complete the
purchase before having to go to Room 207 in the University Inn. CI was
then observed meeting with an African American male in the parking lot of
the University Inn. The male was wearing what appeared to be a dark
colored hooded sweatshirt, dark hat and a white shirt underneath. After
meeting with the male CI was again kept under continuous audio and visual
surveillance until [he] met with law enforcement. CI turned over to law
enforcement (10) white wax bags that were banded together with a small
black rubber band that contained a brown colored substance that appeared
to be heroin[.]

*Id.* at 7, ¶¶ 8-9.

Detective Merchand testified that he did not include in the Affidavit that "there
was a period of time during the operation that [he] thought the deal was not going to
happen" because he thought "it wasn't relevant." Doc. 29 at 39:18-21. He testified that
he believed that the Affidavit's three statements that the CI was subject to continuous
visual and audio surveillance are accurate.

The CI provided a sworn recorded statement following the controlled buy, which
Detective Merchand recounts in the Affidavit as follows:

CI advised [he] completed the transaction in the hotel parking lot
with "Rell." CI advised [he] provided the pre-recorded currency to "Rell"
and "Rell" provided CI with the suspect heroin. CI advised the males did
not originally complete the purchase with [him] because CI felt it was out
in the open. CI advised following the purchase [he] thought the male left in
a vehicle from the hotel. . . . CI was asked about the three males we
observed walking in the area prior to the buy that were observed going into
Room 207. CI advised one of the males was "Rico," the second was "Rell"
and the third was the male I had previously shown him a picture of, Eugene
McNair. CI advised [he] had briefly spoken with "Rell" and was instructed
to wait in the area until CI was contacted.

Doc. 23-1 at 7, ¶ 9. A sample of the substance from the wax paper bags tested positive
for the presence of heroin.

The Affidavit states that law enforcement witnessed the CI returning to the

13

University Inn after the controlled buy. When the CI returned, he vomited in the parking lot, which Detective Merchand attributes in the Affidavit to "possibly experiencing withdrawal." *Id.* at 7-8, ¶ 11. The Affidavit recounts that the "CI was observed meeting with the same African American male in the parking lot [he] had met with before." *Id.* The Affidavit notes that the CI then conducted a second alleged transaction with the same male, who Detective Young observed entering and leaving Room 207 prior to this transaction, and that the transaction was not "conducted by law enforcement." *Id.*

## II.     Conclusions of Law and Analysis.

Defendant challenges the Affidavit as either an intentional or reckless attempt to provide materially false information to the judge who determined probable cause. The government contends that the Affidavit is accurate and reflects no material omissions or misstatements. In the alternative, the government argues that even a "corrected" Affidavit is supported by probable cause and that there is no evidence that Detective Merchand acted either intentionally or recklessly in preparing the Affidavit.

Although the court finds that there is some evidence that Detective Merchand acted either intentionally or recklessly in mischaracterizing certain facts and omitting other facts from the Affidavit, even when those factual misstatements are corrected and the omitted information is supplied, a neutral and detached judge could reasonably conclude that the Affidavit provides probable cause for the search warrant.

### A.     The *Franks* Challenge to the Affidavit.

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. "A search warrant affidavit is presumed reliable." *United States v. Klump*, 536 F.3d 113, 119 (2d Cir. 2008). An issuing judge must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

"[T]he task of a reviewing court is simply to ensure that the 'totality of the

14

circumstances' afforded the [issuing judge] 'a substantial basis' for making the requisite probable cause determination." *United States v. Clark*, 638 F.3d 89, 93 (2d Cir. 2011) (quoting *Gates*, 462 U.S. at 238). In the seminal case of *Franks v. Delaware*, 438 U.S. 154 (1978), the Supreme Court recognized that a challenge to a search warrant could be asserted when the affiant intentionally or recklessly included materially false statements to support a finding of probable cause. *Id.* at 155-56. A defendant can likewise challenge an affiant's intentional or reckless material omissions. *See United States v. Ferguson*, 758 F.2d 843, 848 (2d Cir. 1985). Accordingly, in order to "'suppress evidence obtained pursuant to an affidavit containing erroneous information, the defendant must show that: (1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the [issuing] judge's probable cause [or necessity] finding.'" *United States v. Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 2820 (2014) (quoting *United States v. Canfield*, 212 F.3d 713, 717-18 (2d Cir. 2000)).

To demonstrate the existence of intentional misrepresentations or omissions, the defendant must present the reviewing court with "credible and probative evidence" that any misrepresentations and omissions were "'designed to mislead'" or were "'made in reckless disregard of whether [they] would mislead.'" *Rajaratnam*, 719 F.3d at 154 (quoting *United States v. Awadallah*, 349 F.3d 42, 68 (2d Cir. 2003)). A search warrant affiant "does not *necessarily* act with 'reckless disregard for the truth' simply because he or she omits certain evidence that a reviewing court, in its judgment, considers to be 'clearly critical.'" *Rajaratnam*, 719 F.3d at 154. Rather,

> [t]o prove reckless disregard for the truth, the defendant[] [must] prove that the affiant in fact entertained serious doubts as to the truth of his allegations. Because states of mind must be proved circumstantially, a factfinder may infer reckless disregard from circumstances evincing obvious reasons to doubt the veracity of the allegations.

*Id.* (quoting *United States v. Whitley*, 249 F.3d 614, 621 (7th Cir. 2001)). The "nature of the omissions" is also relevant if they "suggest concealment." *Awadallah*, 349 F.3d at

68. "In addition to its relevance to the 'materiality' inquiry, whether an omission would have strengthened or weakened the [search warrant] application is also probative of whether the omission occurred with 'reckless disregard for the truth.'" *Rajaratnam*, 719 F.3d at 155 n.18.

### B. Deliberate or Reckless Intention to Mislead or Deceive.

Defendant identifies a series of errors and omissions in the Affidavit which he contends were intended to mislead the judge who reviewed the search warrant application. As evidence of Detective Merchand's alleged intent, Defendant points to the evidence presented at the suppression hearing which included Detective Merchand's testimony. The court finds that two of the identified flaws in the Affidavit were intentionally or recklessly made and pertain to matters that are relevant to a determination of probable cause. It therefore addresses Defendant's *Franks* challenge to those flaws at length.[3]

### 1. The Affidavit's Description of the Controlled Buy.

The Affidavit clearly conveys the impression that the controlled buy was undertaken with little or no difficulty under law enforcement's constant surveillance and subject to Detective Merchand's directions. In actuality, during the controlled buy, the CI disobeyed the instructions of law enforcement, entered a mall during which he was

---

[3] Defendant points to the following additional alleged misstatements and omissions which he contends were deliberately or recklessly made: (1) omission of the fact that the controlled buy took approximately thirty minutes to complete when the Affidavit states that only "a short period of time elapsed" between the initial encounter with the suspect and the subsequent encounter, Doc. 23-1 at 7, ¶ 9; (2) the alleged mischaracterization of the CI's criminal history which failed to disclose the CI's nineteen prior convictions in four states; (3) the lack of corroboration of the information the CI provided previously in 2011; (4) the lack of explanation regarding the CI's demeanor during the controlled buy; (5) omission of the CI's question regarding how many officers would be in the area during the controlled buy; and (6) the discrepancies between the CI's description of the person from whom he purchased heroin and the male depicted in the video recording. The court finds that these additional errors and omissions are not critical to a probable cause determination. *See Walczyk v. Rio*, 496 F.3d 139, 161 (2d Cir. 2007) ("[T]he law does not demand that an officer applying for a warrant 'volunteer every fact that arguably cuts against the existence of probable cause,' as long as he does 'not omit circumstances that are critical' to its evaluation.") (quoting *Brown v. D'Amico*, 35 F.3d 97, 99 (2d Cir. 1994)). It nonetheless includes them in the "corrected" Affidavit.

briefly outside law enforcement's sight, made unauthorized telephone calls, was twice reported to have entered the University Inn when he did not enter it at all, and was described by law enforcement as so "paranoid" and so rogue that law enforcement officers can be heard on the video cursing the CI and expressing a desire to "punch him." (Doc. 30-3 at 2:12-18.) A hand-to-hand transaction was not witnessed by any of the law enforcement officers, and Detective Merchand conceded in his testimony that he did not even believe a drug transaction had occurred until the CI was searched and debriefed after the controlled buy.

The omitted facts would have provided the judge with an accurate statement of what transpired during the controlled buy which, in turn, was the crux of the probable cause determination. In light of the "sanitized" version of the controlled buy set forth in the Affidavit, a reasonable inference may be made that Detective Merchand acted either intentionally or recklessly in omitting this information. *See Awadallah*, 349 F.3d at 68 (directing courts to consider whether the nature of the omissions suggest an intent to conceal); *see also Velardi v. Walsh*, 40 F.3d 569, 575 (2d Cir. 1994) (explaining that the omission of certain facts could be critical to a probable cause determination when the affidavit otherwise implies that the contrary is true and material).

Compounding the Affidavit's failure to reflect the true circumstances of the controlled buy is the Affidavit's three averments that the CI was kept under "continuous visual and audio surveillance." Doc. 23-1 at 7, ¶¶ 8, 9. These statements are indisputably inaccurate. Detective Merchand, as the sole operator of the video and audio equipment, must have known these statements were false when he made them as he acknowledged in his testimony that "[t]here wasn't any rhyme or reason for the video," Doc. 29 at 13:16-19, he admitted that he could not hear all of the CI's conversations, and he acknowledged that he put the video camera down when he was making phone calls or engaged in other tasks. The evidence further demonstrated that neither Detective Merchand nor the other members of the surveillance team had "eyes on" or could hear the CI during the entire controlled buy. *See Rajaratnam*, 719 F.3d at 154 (explaining that "a factfinder may infer reckless disregard from circumstances evincing obvious reasons to doubt the veracity of

the allegations"). The video and audio recordings themselves make this point abundantly clear. However, even after the recordings were presented to the court in the suppression hearing, Detective Merchand maintained under oath that his repeated statements in the Affidavit that the CI remained under constant visual and audio surveillance were accurate. It is difficult to discern how he could credibly maintain this claim in the face of the evidence to the contrary.

For the foregoing reasons, the court finds that Defendant has satisfied his burden under *Franks* to have information regarding the circumstances of the controlled buy included in a "corrected" affidavit for the purposes of determining probable cause.

### 2. The CI's Credibility.

The Affidavit also omits certain information that was essential to evaluating the CI's credibility. As the CI was virtually the sole source of the background information set forth in the Affidavit, these omissions were clearly relevant to a probable cause determination.

In assessing the existence of probable cause based on information offered by a confidential informant, the court must examine the "totality of the circumstances," including the informant's veracity, reliability, and basis of knowledge. *United States v. Gagnon*, 373 F.3d 230, 235 (2d Cir. 2004) (internal quotation marks and citations omitted). "The core question in assessing probable cause based upon information supplied by an informant is whether the information is reliable." *United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993). When "a warrant affidavit is based upon information provided by a confidential informant, any omissions become all the more glaring because any material omission necessarily alters the 'totality of the circumstances' upon which the confidential information is to be assessed." *McColley v. Cnty. of Rensselaer*, 740 F.3d 817, 824 (2d Cir. 2014). "In the face of information that is provided by a confidential informant, each individual fact that composes the totality of the circumstances is all the more likely to be critical to the evaluation of probable cause." *Id.* (internal quotation marks omitted).

Here, the Affidavit describes the CI as an individual seeking to "change [his] lifestyle." Doc. 23-1 at 5, ¶ C.1. Detective Merchand testified that he could not affirm

whether he believed the CI was seeking to turn his life around at the time, but he was subsequently convinced that the CI had no such intent. The circumstances of the controlled buy "evinc[ed] obvious reasons to doubt the veracity" of this statement which was included in the Affidavit *after* Detective Merchand knew the CI was engaged in unauthorized drug purchases both before and after the controlled buy. *Rajaratnam*, 719 F.3d at 154 (internal quotation marks omitted). There is thus no evidence to support a conclusion that Detective Merchand included this statement in the Affidavit because he believed it to be true. The Affidavit's failure to disclose law enforcement's payment of $100 in additional consideration to pay off the CI's drug debt to the targets of law enforcement's investigation supports a conclusion that the omission of accurate information regarding the CI's motivation was either reckless or intentional.[4] Any intent to mislead, however, was mitigated to some extent by the Affidavit's recitation of other facts that were sufficient to call into question the sincerity of the CI's desire to become a law-abiding citizen.

Detective Merchand conceded in his testimony that he intentionally omitted from the Affidavit certain "relevant" information regarding the CI's credibility which included the fact that the CI was facing two pending charges for false information to a police officer. Doc. 29 at 71:6-11. The law recognizes that crimes of dishonesty are central to evaluating credibility. *See* Fed. R. Evid. 609(a)(2) (providing that a crime involving "a dishonest act or false statement" may be used for impeachment, regardless of whether it is a misdemeanor or felony); *United States v. Tracy*, 36 F.3d 187, 192 (1st Cir. 1994), *cert. denied*, 514 U.S. 1074 (1995) (holding that there is no balancing test under Fed. R. Evid. 403 for a conviction for a crime of dishonesty or false statement and, if properly authenticated, the trial court has no discretion to exclude such a conviction for purposes of impeachment). Detective Merchand's purported reasons for omitting this evidence are implausible. He appears to claim that information regarding pending charges was not

---

[4] Ironically, this information may have enhanced the CI's status as a source of non-stale information regarding drug dealing in the area.

required by state law. *Cf. State v. Goldberg*, 2005 VT 41, ¶¶ 12, 16, 178 Vt. 96, 101-02, 872 A.2d 378, 382-83 (reversing trial court's conclusion that search warrant was supported by probable cause and noting that a statement that the informant sought to obtain "consideration on his pending criminal case in Chittenden District Court" was inadequate because Detective Burke provided no "further information about the nature of [the informant's] prosecution, or the consideration he hoped to receive" and observing that there was "almost nothing in the affidavit to suggest that [the informant] was inherently reliable, and, if anything, the information regarding [the informant's] pending criminal case tends to weigh against his credibility" because the informant "was not a typical citizen informant without any connection to the police. Rather, he was facing prosecution on a serious criminal charge [a DUI], and hoped to exchange his information for a favorable plea agreement"). Additionally or alternatively, Detective Merchand claims that if the nature of two of the eleven charges pending against the CI was disclosed, the CI's identity would be compromised. He could not, however, explain how a CI could be identified in this manner.

The court concludes that the fact that the CI received payment of a drug debt as part of the consideration for the controlled buy and the fact that the CI was facing two pending charges of false information to a police officer, when juxtaposed against the Affidavit's affirmative statements that the CI was seeking to change his lifestyle and maintain sobriety, were either reckless or intentional omissions from the Affidavit. If disclosed, this information would have caused a neutral and detached judge to discredit either all or part of the CI's uncorroborated information. *See Rajaratnam*, 719 F.3d at 155 n.18 (explaining that whether the omitted information would have "weakened the [search warrant] application is also probative of whether the omission occurred with 'reckless disregard for the truth'"). The court thus finds that they satisfy the standard under *Franks* and its progeny for inclusion in a "corrected affidavit."

## C. The Corrected Affidavit.

"To determine whether misstatements are material, a court must set aside the falsehoods in the application and determine whether the untainted portions of the

application suffice to support a probable cause . . . finding." *Rajaratnam*, 719 F.3d at 146 (internal quotation marks, citations, and alterations omitted). "If the untainted portions of the application are sufficient to support the probable cause . . . finding[], then the misstatements are not 'material' and suppression is not required." *Id.* "Omissions from an affidavit that are claimed to be material are governed by the same rules," *Ferguson*, 758 F.2d at 848, and are material only if "necessary to the issuing judge's probable cause finding." *Klump*, 536 F.3d at 119 (internal quotation marks and alterations omitted). "The ultimate inquiry is whether, after putting aside erroneous information and material omissions, there remains a residue of independent and lawful information sufficient to support probable cause." *Canfield*, 212 F.3d at 718 (internal quotation marks omitted).

A "corrected" Affidavit in this case provides the following information. The CI used in the controlled buy had a criminal history that consists of nineteen convictions in four states, including a conviction for false information to a police officer. The CI was facing eleven pending charges including two separate charges for false information to a police officer. Law enforcement promised that he would receive unspecified consideration on these pending charges in exchange for his services. In addition, law enforcement agreed to pay a $100 for an outstanding drug debt the CI owed to the targets of law enforcement's investigation. The CI provided information that these targets were dealing drugs out of the University Inn and the Anchorage Inn and on February 22, 2012, the CI had purchased drugs from these individuals on another person's behalf.

On February 23, 2012, the CI was searched and found not to be in possession of illegal drugs, contraband, or money. He was equipped with a recording device and law enforcement provided him with funds to use to purchase narcotics. Detective LaBarge dropped the CI off outside the University Inn. The CI asked about the number of officers who would be in the area during the controlled buy. The CI walked to entrance of the University Inn and stood behind a lattice for approximately one minute. Although Detective Merchand could not clearly see the CI, the CI did not enter the University Inn. During this time, the CI was heard through his recording device talking on his cell phone and telling someone that he had been dropped off by his girlfriend because he did not

want her to see what was going on, that he was on foot waiting, and that he would do and go wherever he was told to go. The CI then emerged from behind the lattice, holding a cell phone to his ear, and walked away from the Inn and towards the University Mall. As he did so, he encountered three African American males, one of whom stopped and spoke briefly with the CI. The meeting occurred in the open, and no hand-to-hand transaction was witnessed. The three males were later observed entering and exiting Room 207 of the University Inn.

The CI entered the University Mall, although ordered not to do so. Detective LaBarge, the officer following the CI on foot, did not have eyes on the CI for approximately fifteen to twenty seconds. After a brief confrontation in the mall between Detective LaBarge and the CI, the CI called Detective Merchand, who instructed him to leave the mall. The CI received at least one unauthorized call and was acting paranoid as he walked back to the University Inn.

In the University Inn's parking lot, CI met and stood in close proximity to the same African American male with whom he was previously seen speaking. Detective Merchand could not see either individual's hands and at that time he believed that a deal was not going to occur. However, another officer who had eyes on the CI stated, "You know what . . . I think your motherf***ing, your dude might've saw me walking out and he literally just struck a deal on those guys, 'cause I heard . . . ." Doc. 30-3 at 3:1-2. After a brief period, the CI called Detective Merchand to report he did the "deal." *Id.* at 3:8-9.

The controlled buy transpired over approximately thirty minutes during which law enforcement maintained intermittent video and audio surveillance. However, except for the CI's brief entry into the mall, one or more of the law enforcement officers had "eyes on" the CI during most of the controlled buy. At the controlled buy's conclusion, the CI turned over to law enforcement a substance that tested positive for heroin. The CI vomited after the controlled buy, which may have been a symptom of drug withdrawal.

In his written statement, the CI advised that the male from whom he had purchased the heroin was wearing black sweats, a hooded sweatshirt, and headphones.

The male depicted in the video as interacting with the CI, however, was wearing jeans, a black hooded sweatshirt, and a black hat with a brim. After the controlled buy, the CI returned to the University Inn to engage in what appeared to be an unauthorized purchase of illegal drugs from this same individual.

### D. Whether the Corrected Affidavit Established Probable Cause.

Assessing "the totality of the circumstances" presented in the corrected Affidavit, there must be "sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed." *United States v. Steppello*, 664 F.3d 359, 363-64 (2d Cir. 2011) (internal quotation marks omitted). "Once it is established that probable cause exists to believe a federal crime has been committed a warrant may issue for the search of any property which the [issuing judge] has probable cause to believe may be the place of concealment of evidence of the crime." *Zurcher v. Stanford Daily*, 436 U.S. 547, 558 (1978) (internal quotation marks omitted).

"A police officer has probable cause to conduct a search when the facts available to [him or her] would warrant a [person] of reasonable caution in the belief that contraband or evidence of a crime is present." *Florida v. Harris*, 133 S. Ct. 1050, 1055 (2013) (internal quotation marks omitted). The "totality of circumstances [must] indicate[] a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Clark*, 638 F.3d 89, 94 (2d Cir. 2011) (requiring a "nexus between the items sought and the particular place to be searched") (internal quotation marks omitted).

"[A]n affidavit that supplies little information concerning an informant's reliability may [still] support a finding of probable cause, under the totality of the circumstances, if it includes sufficient corroborating information." *United States v. Woosley*, 361 F.3d 924, 927 (6th Cir. 2004). "An informant's participation in supervised drug purchases is powerful corroborative evidence for purposes of determining probable cause." *United States v. Wagner*, 989 F.2d 69, 73 (2d Cir. 1993) (collecting cases) (citing *United States v. Adams*, 759 F.2d 1099, 1114 (3d Cir. 1985); *United States v. Sandoval*,

550 F.2d 427, 430 (9th Cir. 1976)); *see United States v. McKinney*, 143 F.3d 325, 329 (7th Cir. 1998) ("Controlled buys add great weight to an informant's tip.").

As the First, Eighth, and Tenth Circuits have explained, even where an affidavit contains no information regarding an informant's reliability, it may still establish probable cause if a law enforcement officer "confirmed the information with which the confidential informant provided him [or her] by carrying out a carefully-executed 'controlled buy.'" *United States v. Garcia*, 983 F.2d 1160, 1167 (1st Cir. 1993); *accord United States v. Pennington*, 287 F.3d 739, 742 (8th Cir. 2002) (concluding there was probable cause to search farm buildings because, "by arranging and monitoring a controlled buy at [this] farm, the officers reliably corroborated the CI's information that [the suspect] was manufacturing and distributing methamphetamine at that location").

Courts have described a "carefully-executed" controlled buy as one in which the informant was searched prior to the controlled buy for contraband, watched as he entered and then exited the suspect location, and entered the suspect location with buy money and emerged with narcotics. *See Garcia*, 983 F.2d at 1166-67; *accord United States v. Artez*, 389 F.3d 1106, 1111-12 (10th Cir. 2004) (concluding that "[a] tip from an anonymous or confidential informant that narcotics are being distributed at a particular location may be corroborated" by a controlled buy that observes "common formalities," including searching the CI and providing money prior to the buy, watching the CI "enter the suspect residence, disappear while inside the suspect residence, and emerge from the suspect residence," and then searching and retrieving narcotics from the CI); *see also Steppello*, 664 F.3d at 364, 366 (holding affiant's knowledge of one prior cocaine deal was sufficient corroboration of informant's tip and these facts "were sufficient to provide police with probable cause" to arrest the informant's alleged source of supply).

In this case, although the CI was of questionable reliability and there was only one controlled buy, the evidence was sufficient to support a reasonable conclusion that the probable source of heroin found on the CI after the controlled buy was the male with whom he was seen interacting in the University Inn parking lot. Law enforcement surveillance established that this male was staying in Room 207 of the Inn, with two

other males who also appeared to have some involvement in the controlled buy. It further established that the three men entered and exited Room 207 prior to the controlled buy. Because the search warrant was granted and executed within hours of the controlled buy, there was a "fair probability" that evidence of heroin distribution would be found in the location to be searched. *Clark*, 638 F.3d at 94 (internal quotation marks omitted); *see also United States v. Martin*, 426 F.3d 83, 86 (2d Cir. 2005) ("[P]robable cause only requires 'the probability, and not a prima facie showing, of criminal activity.'") (quoting *Gates*, 462 U.S. at 235).

While the lack of continuous surveillance raises a question regarding other potential sources of the heroin obtained by the CI, this same concern is present anytime a controlled buy involves an informant entering and exiting a building or a car outside law enforcement's presence. In *Garcia*, the First Circuit found that the possibility that the informant could have stashed the cocaine out of sight and used it to frame the defendant "strain[ed] credulity on a common-sense reading [of the affidavit]." *Garcia*, 983 F.2d at 1167. Other courts agree that the existence of constant surveillance is not dispositive. *See Artez*, 389 F.3d at 1112 ("[T]he absence of constant visual contact with the informant conducting the transaction does not render a controlled purchase insufficient, nor does the absence of an audio-recording of the transaction."); *see also United States v. Sidwell*, 440 F.3d 865, 869 (7th Cir. 2006) (rejecting argument that an informant "could have purchased the cocaine from any person in any unit in that building" because, while "theoretically possible," that possibility did not "negate the existence of probable cause," which requires only a "substantial chance that evidence may be found"); *United States v. Henry*, 299 F. App'x 484, 486-88 (6th Cir. 2008) (affirming district court's determination that warrant was supported by probable cause even though affidavit merely stated CI was "reliable" and described a controlled buy during which the CI was permitted to travel independently to and from the suspect house in a car that had not been searched because the CI was searched before the controlled buy and later turned over to the officers a bag of crack cocaine and because surveillance, albeit imperfect, was conducted "before, during, and after the controlled purchase").

In the controlled buy at issue here, any concern regarding an alternative source of the heroin found on the CI was negated to a large extent by the presence of law enforcement officers who maintained surveillance of the CI during at least portions of the controlled buy and who witnessed the CI's interaction with only one other individual. Accordingly, "after putting aside erroneous information and material omissions, there remains a residue of independent and lawful information sufficient to support probable cause." *Canfield*, 212 F.3d at 718 (internal quotation marks omitted). Although a close question, Defendant has therefore failed to demonstrate that "the alleged falsehoods or omissions were necessary to the judge's probable cause . . . finding." *Rajaratnam*, 719 F.3d at 146 (internal quotation marks omitted). In such circumstances, suppression is not warranted. *Id.*

## CONCLUSION

For the reasons above, the court hereby DENIES Defendant's motion to suppress evidence. (Doc. 23.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 15th day of October, 2014.

Christina Reiss, Chief Judge
United States District Court

26